## KING & CLOPTON VS. JARMAN.

1. SALE OF CHATTELS: *Statute of frauds: Delivery.*
    With regard to bulky articles, or those not immediately accessible, symbolical delivery, by something which may be proved *in pais* of a satisfactory nature, satisfies the reason and policy of the statute of frauds.

King & Clopton vs. Jarman.

2.  SAME:   *When title passes.*

Where the minds of the parties have assented to the present purchase and sale of a specific chattel, which may be clearly identified and separated from other property, and the sale be dependent on no conditions or contingencies, and such possession be given as the nature of the subject and the situation of the parties with regard thereto will permit of, and the vendor has done all that is required of him with respect to the property, the title will pass, notwithstanding something may still be necessary on the part of the vendee to ascertain the exact price.

APPEAL from *Phillips* Circuit Court.

Hon. J. N. CYPERT, Circuit Judge.

*Tappan & Hornor,* for appellants.

*Rose, contra.*

EAKIN, J.   Jarman sued King and Clopton in an action at law for the price of six bales of cotton, which, he alleges, he sold to them.   They denied the sale, and that was the sole issue.   It was tried by a jury, which found for the plaintiff, and the court rendered judgment accordingly.   A motion for a new trial was overruled, and defendants appealed.

There is little or no conflict in the evidence, which reveals the following facts:   Jarman, who was a customer of King & Clopton, merchants and cotton buyers at Helena, and kept an account with them, had six bales of cotton in a warehouse there for sale, which had been weighed, and marked for identification.   He came to town on the fifteenth of February, 1877 ; made some purchases, and was desirous of returning on the train, which left about 3 o'clock in the afternoon.   He produced his samples taken that day to Clopton, one of the firm, who made him an offer to purchase the cotton at a fixed price per pound, which was accepted, being ten and a half cents for three bales, and

---

King & Clopton vs. Jarman.

---

eleven and three-fourths for the three others, whereupon he gave the following order upon the warehouse:

"HELENA, ARK., February 15, 1877.

"Messrs. Paul F. Anderson & Co. will deliver my six bales of cotton to Messrs. King & Clopton, three bales marked 'A. G. J. (S.),' and three bales 'S. M. R.'

"A. G. JARMAN."

· He testifies that, upon giving the order, he told Clopton that the bales had been weighed; that he could take the weight off from the bales, place the amount to plaintiff's credit, and send him a statement, to which Clopton, handing him back the samples, replied, "Very well. All right. I will send Dick Cook down to attend to. it." He says, further, that he does not know of any uniform custom in Helena as to selling cotton. After this the plaintiff took the train and left town.

Dr. W. H. Jarman, who accompanied plaintiff to King & Clopton's store, and was present at the negotiation, says that plaintiff was in a hurry to leave on the train. "Col. Jarman was standing up, facing Mr. Clopton, and said that the cotton had been weighed since it was put in the warehouse; 'all that you have to do is to get off the weights, and place the amount of the value of the cotton to my credit.' Clopton said, 'Very well, Col. Jarman. I will send Cook down right away.' We then left the office, all parties being pleased."

James W. Clopton's account of the transaction is: "After a little conversation between us, we agreed upon the price. Col. Jarman asked me to go with him immediately and receive the cotton. He said he wanted to go on the train, and did not have much time to spare. I told him I could not possibly leave the office, but that Mr. Cook, our cotton

man, was absent, and as soon as he came back I would get him to go and attend to it. He then wrote an order. * * * Col. Jarman left immediately, as he seemed to be in a great hurry, etc. In an hour, or half hour, he saw Cook, and gave him the order to attend to. He saw nothing more of Cook until next morning, when he still had the order.

"Meanwhile the warehouse had been destroyed by fire during the night. Only one of Jarman's bales had been saved, which, by inadvertence, was afterwards shipped off with other cotton of King & Clopton's, and for which they offered, and are still willing, to account with plaintiff."

Charles Rostrop, an employee of the warehouseman, says that on the evening before the fire, Mr. Cook met him at Burnell & Turner's shed, and said he wanted to get Col. Jarman's cotton, and have ticket changed. Witness was busy, and could not go at once. Cook waited until it became too dark to go into the warehouse without a light, which the warehouseman would not permit. Witness then told Cook to wait till morning. Cook did not show any order. Witness always required the order before tickets were changed.

Anderson, the warehouseman, says that he met Jarman on the street about 3 o'clock, on the fifteenth of February, 1877, who told him that he had given an order on him, to King & Clopton, for the six bales of cotton, and asked witness to take off the weights and marks and send them to him by mail. He told witness that he had sold the cotton to King & Clopton, and that Cook would come down to receive it; that he did not, himself, have time to attend to it. He directed witness to turn it over to King & Clopton. When Cook came it was too dark to go into the warehouse without a lamp.

13

The witness was asked on the trial, by plaintiff: "For whom were you holding that cotton, after you had a conversation with Jarman and Dick Cook, clerk of King & Clopton?" To which he answered: "I would have given the cotton to King & Clopton, relying upon the integrity of the parties. I considered it theirs; and if I hadn't, I would not have shipped it for them. I thought it was transferred to King & Clopton. I saw no order, nor was any delivered to me." The single bale saved, the witness had shipped for King & Clopton without any special order, and, it seems, contrary to their intention.

Cook testifies that he had to wait upon the warehouse clerk upon the evening in question, until it was too dark to go into the warehouse and attend to the business. He explained to the clerk that he wanted to see the cotton, re-sample and re-weigh it, and get the marks on it. The clerk promised to roll it out and deliver it next morning. About that time Anderson, the warehouseman, rode up, and promised to deliver the cotton next morning and give a receipt for it. The order was never presented.

Some witnesses deny that Jarman asked Clopton to go with him and receive the bales.

There was evidence of a general custom in Helena with regard to cotton buying; that when sales were made by sample, it was usual for the purchaser to proceed, with all convenient dispatch, to re-sample, and that he had the option to reject the cotton if the bulk should not correspond with the sample shown. After re-sampling, it was usual to pay the money or merchandise; and the purchaser, if it had been weighed, had the option to take it at the weights already fixed, or to have it re-weighed, and take a ticket. Some witnesses say, however, that there

King & Clopton vs. Jarman.

was no unvarying custom, but that these matters are subject to special agreement or understanding.

Very full instructions on both sides, and of the court's own motion were given. Taken altogether, they substantially present the law, and no complaint is made in the motion for a new trial, with regard to them. It is simply based upon the grounds that the verdict was contrary to the law and the evidence.

The first question which arises is under the statute of frauds, which provides that no sale of property over the value of thirty dollars shall be binding unless there be: First, some note or memorandum of the contract for sale, signed by the party to be charged; or second, unless the purchaser shall accept a part of the goods so sold, and actually receive the same; or third, shall give something in earnest to bind the bargain, or in part payment thereof.

<span style="float:right">1 SALE OF CHATTELS: Statute of frauds.</span>

A simple order to deliver property to another, does not necessarily imply any contract for sale. It is compatible with many other intentions, than a transfer of title. It may be for change of custody, or to be held as a pledge, or in some other way, as bailee. It is not a note or memorandum of a sale. Nothing in this case was given as earnest. The credit to be entered was *in futuro*, when the amount should be calculated from the weights, either as shown by the bale marks, or, if the purchaser should choose, by actually weighing. Did the purchaser, then, accept and actually receive the cotton? That he accepted, and that unconditionally, is shown by the evidence. Whatever may have been the general custom as to reserving the privilege of sampling; and whatever the law may presume in case of such purchases by samples, as to the reserved right of testing the bulk, it is, nevertheless, very clear that parties may agree to an immediate transfer of property with or without

samples.   They may be used only to influence the judgment
of the purchaser, who may act upon his confidence in the
seller, and make a positive purchase on the spot.   Of course,
he might rescind the contract in case of fraud, or recoup
for difference of value, in case the bulk should fail materi-
ally, to answer the samples, but there is no charge in this
case of either.   The jury had before them the facts—that
the buyer and seller stood in the relation to each other of
merchant and customer, reposing mutual confidence;  that
the vendor was pressed for time, and unable to attend to
the usual course of sale; that he left without any other re-
quest than to be advised of the amount of the credit he would
receive, or what was the same, of the weight of the cotton,
of which he did not have with him the memorandum.  This,
a prudent man, careful of his affairs, would have naturally
desired, if the contract had been expressly, and in the most
indubitable terms, a present sale and transfer of property.
The jury could not have well found room to doubt, upon
the whole case, that the cotton was *accepted*, so far as the
mind and intention of Clopton could constitute an accept-
ance, and that such acceptance, so far as the *ownership* was
concerned, was unconditional.

DELIVERY:
Symbolical
not abol-
ished by
the statute.

Having the intention to accept, did he *actually* receive.
The statute has never been, in this state, nor in England,
whence we derived it, construed to abolish the doctrine of
*symbolical delivery*.   Whoever receives in such mode as the
nature of the property, or its situation makes necessary,
receives as actually as by manual caption, or asportation, or
some direct interference with the *corpus* of the property.
With regard to bulky articles, or those not immediately ac-
cessible, symbolical delivery, by something which may be
proved *in pais*, of a satisfactory nature, satisfies the reason
and policy of the statute.   This court has expressly so

King & Clopton vs. Jarman.

held in similar cases. (See case of *Puckett v. Read, 31 Ark., 131.*) The order for delivery, although not evidence of a contract, nor even a memorandum of one, was nevertheless a *thing* absolutely potent to confer the right of immediate possession, except as against warehouse liens (of which none are shown), and even stronger evidence of that right, than would have been a gin receipt. The jury, under the evidence and law of the case, as presented by the court, did not err in finding that the defendants received the cotton. This satisfies the statute.

It remains to inquire if anything more was necessary to pass the property. The common law principle applicable to this case, has been long settled, clearly formulated and reiterated in numberless opinions and text-books. It is ever arising again, not from any doubt as to its terms, but from the difficulty of its application amidst the infinite shades of difference in the circumstances of different cases. It may be stated thus:

Where the minds of the parties have assented to the present purchase and sale of a specific chattel, which may be clearly identified, and separated from other property, and the sale be dependent on no conditions nor contingencies, and such possession be given as the nature of the subject, and the situation of the parties with regard thereto, will permit of, and the *vendor* has done all that is required of him with respect to the property, the title will pass. And this will be so, notwithstanding something may be still necessary, on the part of the vendee, to ascertain the exact price. That, when intrusted to the vendee, is a matter of confidence not affecting the sale. One may sell and transfer to another a specific lot of neat cattle, for instance, to be paid for at so much per pound when butchered and sold; or a hogshead of meat, to be weighed by the vendee

*2. CHATTEL SALES: When title passes in.*

on taking it to his house, and paid for by the pound at a fixed rate. These things enter into the daily course of traffic, and it would be highly embarrassing to hold that, in such cases, title did not pass to the vendee until all should be done by both parties to fix quantity, quality, or price. The jury were, in this case, warranted in finding that the sale had been made.

In this case, the plaintiff had not only done everything required and expected of him, but more. He had seen the warehouseman, advised him of the sale and order, and directed him to act upon it; and had gone home, without any thought of seeing or claiming the cotton again. He trusted defendants to make proper credits, and advise him of the weights. Evidently, the defendants did not wish nor expect him to do anything more. They should bear the loss.

Affirm.